## In re SITTON.

## STATE BAR COMMISSION ex rel. BRIDGES v. SITTON.

No. 9444—Opinoin Filed Nov. 19, 1918.

Rehearing Denied Jan. 13, 1919.

(177 Pac. 555.)

(Syllabus.)

1. **Attorney and Client — Criminal Law — Supreme Court — Nature of Disbarment Proceedings.**

The Supreme Court is not a criminal tribunal, and disbarment is not a criminal, or punitive proceeding; but the direct question in such proceeding is whether or not the character and conduct of the respondent is such that this court should protect the public and courts of justice against him.

2. **Attorney and Client — Duty and Fidelity of Attorney—Disbarment.**

The lawyer's life must be one of fidelity and stern integrity. There is no place of the bar for the unscrupulous, and the cheeks of the lawyer, who besmirches his profession, should be made to burn with shame: but disbarment means professional excommunication and death, and should be resorted to only when it is apparent that the interest of the community, the integrity of the courts, or the honor of the profession, imperatively demands it.

Proceedings by the State Bar Commission, on the relation of D. A. Bridges, for the disbarment of H. W. Sitton. Respondent reprimanded.

T. B Reeder and C. Riley, for proponent.

Edward H. Bond, S. I. Kolb, G. F. Womack, R. H. Brown, J. B. Wilkinson, and Ames, Chambers, Lowe & Richardson, for respondent

BRETT, J. This is a disbarment proceeding commenced by the Bar Commission based upon charges filed against H. W. Sitton by D. A. Bridges, both members of the bar of Duncan, Okla.

Sitton, who will be referred to as respondent, while county attorney of Stephens county, collected something near $1,000 on criminal bonds or recognizances, which were forfeited during his tenure of office, and, instead of deducting the 25 per cent. allowed him for collecting these bonds and turning the remainder into the county treasury of Stephens county, he held the whole amount, claiming that the county was indebted to him in an amount in excess of the sums retained by him by reason of the fact that the county had never paid him certain commissions that were due him on ecrtain civil bonds which he had collected.

The evidence showed that 25 per cent. commission on the civil bonds collected by him, and which he claimed that the county owed him, amounted to $1,171.57.

Sitton, the respondent, had served two terms as county attorney and was then elected to the Legislature, being succeeded as county attorney by D. A. Bridges, who will be referred to as relator.

Bridges, the relator, asked for a second term as county attorney, and the respondent entered the race as a candidate against him. During the campaign the relator sprung the fact that Sitton, his opponent, while county attorney, had collected and held the money on the bonds as above stated and prosecuted him for embezzlement. Sitton defended himself against the charge of embezzlement, and the referee finds "that upon a trial he was acquitted," but states:

"I am unable to determine from the evidence whether this trial was before a jury or whether it was a preliminary examination."

And. although the withholding of this money was made an issue in the campaign for

county attorney, the respondent also defeated the relator at the polls.

The relator then filed these charges with the Bar Commission and asked that the respondent be disbarred.

The statute, under which the disbarment proceeding is brought, is subdivision 3 of section 252, Revised Laws of 1910, which provides for the disbarment of an attorney "for the willful violation of any of the duties of an attorney or counsellor." And it is insisted by the relator that the conduct of the respondent in withholding this money collected on these bonds brings him squarely within the provision of the statute, while it is urged with equal earnestness by the respondent that he withheld the money in good faith and with no corrupt motive or intention.

This is not a criminal action, and this court is not the tribunal designated by our statute to try criminal cases, and the respondent is not on trial here for embezzlement; but the direct question is whether or not the character and conduct of the respondent is such that this court should protect the public and the courts of justice against him. The respondent has had his day in the criminal courts. The relator prosecuted and tried him in the courts designated by statute to hear and determine criminal actions, and, so far as the criminality of his conduct is concerned, we shall presume that the court intrusted to hear and determine that question discharged its duty, and we shall not attempt to invade its province, or question its integrity. Had he been convicted of a felony or a misdemeanor involving moral turpitude, under the statutory directions, we would have accepted the record of conviction as conclusive, and, since that same tribunal has acquitted him, we shall accredit the same verity to its decision.

The statute is intended to protect the public and courts of justice from an attorney who willfully, perversely, with an evil intent, and without jutifiable excuse, violates the high and confidential relations of attorney and counselor—to maintain the exalted position to which the pioneers through sacrifice and toil have lead the bar—for the lawyer occupies a most delicate and confidential position, and there is no room at the bar for the unscrupulous. But the lawyer's life must be one of fidelity and stern integrity, for his client's all is placed in his hands; his life, his property, and his honor are intrusted to his attorney, and he must guard all this well. For his fidelity to this trust means more than the mere plaudits of the curious. It may mean a life saved, a son given back to the bosom of the family; that the tottering form of the old man of the home may be handed to the grave in peace; that the daily bread may not be taken from the widow's table; and that the orphan's cheek may not grow pallid with hunger. It often means all this and more, to be a conscientious, skillful lawyer; and the cheeks of him, who besmirches this high and virtuous calling, should be made to burn with shame.

But disbarment means professional excommunication and death. It means to loose the moorings and turn a life adrift, and should be resorted to only when it is apparent that the interest of the community, the integrity of the courts or the honor of the profession, imperatively demands it. And neither of these conditions prevail in the instant case. The judges of both the county and district courts, under oath, testify as to the good character and professional integrity of the respondent in their courts. Private citizens, under oath, and the electorate at the polls, have spoken as to his good character and integrity in the community; and, in the face of these tokens of confidence, we shall not say that he deserves, or that the interest of the community or integrity of the courts demand his professional execution.

But he did wrong in holding this money as he did. The Legislature of 1910 (section 24, c. 69, Session Laws 1910) passed an act forbidding county attorneys to engage in civil practice, but provided that—

"In addition to his annual salary, he [the county attorney] shall receive twenty-five per cent. of all forfeited bonds and recognizances by him collected."

And when the respondent collected the civil bonds heretofore referred to, he turned the money in to the county treasurer, and filed a claim with the county commissioners for 25 per cent. of the amount as his commission. The county commissioners did not question his right to the commission, or refuse to pay it on the ground that he was not entitled to it, but stated that there was no fund upon which they could draw a warrant to pay it. The respondent asked certain deputy state auditors if they knew of any procedure by which he could get his money; and they stated to him that he could either sue the county and reduce his claim to a judgment, or hold the amount out of any bonds collected by him in the future; that this latter procedure was a little irregular, but that this was being done by county attorneys all over the state

The respondent acted upon the latter suggestion, and held out this $1,000 collected by him on criminal recognizances, until his attention was called to a decision of this court (Pope v. Board of Commissioners, 45 Okla. 521, 146 Pac. 222) to the effect that, under the act of 1910, county attorneys were not entitled to a commission on civil bonds collected by them. He then refunded this $1,000 less his commission.

We do not, in the light of this record, question the motives of the respondent, but he should not have held one penny of the county's money that had come into his hands, even in satisfaction of a claim against the county that he believed to be justly due him, without the knowledge and express consent of those authorized and empowered to act for the county that this might be done. Before he applied one cent of the county's money, which had come into his hands, to the payment of a debt due him by the county, no matter how just it might have been, he should have taken the matter up with the county commissioners and had them to direct him to satisfy his claim against the county in this way. This would have relieved the respondent from any imputation of fraud; for it would have then become the act of the county commissioners, and been the method selected by them of satisfying a debt against the county. For one has no right to divert a fund intrusted to him, except by the direction and upon the authority of the one who intrusted it.

We therefore severely reprimand the respondent for thus diverting this fund, and laying himself liable, as a member of the bar, to the charge of professional misconduct and fraud, but, in the light of the record, refuse to disbar or suspend him.

All the Justices concur, except SHARP. C. J., not participating, and HARDY and MILey, JJ., dissenting.

HARDY, J. I dissent. I think the court misunderstands the record in several important particulars. It is stated that defendant has been acquitted of the charges against him in the courts designated by statute to hear and determine criminal actions. It will be seen by reference to the case of Marshall v. Sitton, 68 Okla. 175, 172 Pac 964, where petition for rehearing was denied May 14, 1918, that mandamus was issued to J. W. Marshall, county judge, commanding a change of venue in two criminal cases pending against respondent at that time growing out of the facts involved in this proceeding. The referee's report was filed January 7,

1918. There is nothing in the record that in the slightest intimates an acquittal in either of these two cases. Again, it is stated that the board of county commissioners did not question defendant's right to the commissions claimed or refuse to pay them on the ground that he was not entitled thereto. Mr. Geo. H Johnson, one of the county commissioners, testified that Sitton presented a claim for his commissions upon civil bond which was denied on the ground that he was not entitled thereto, and that Sitton represented to the board of county commissioners that he had an opinion from the Attorney General holding that he was entitled to such commissions, and that the board instructed the county clerk to write to the Attorney General for a copy of the letter, which Sitton claimed to have received. The letter held to the contrary.

These proceedings were instituted upon the recommendation of the Bar Commission, and a referee was appointed, who heard the evidence and filed a report, in which he found the charges to be true and recommended the disbarment or suspension of respondent. The majority opinion does not review the evidence upon which the report is based, but ignores the findings of the referee. In Town of Grove v. Haskell, 31 Okla. 77, 116 Pac. 805, in speaking of the effect to be given the report of the referee in an original proceeding pending in this court, it was said:

"However, the report of the referee appointed to take the evidence and report the same to this court with his findings of fact and conclusions of law, would not be conclusive on either. It should and would be accorded every reasonable presumption of being correct, with the burden on the party attacking it, but to be freely set aside by the court if found to be incorrect."

In support of this rule, the court cited Girard Life Insurance, Annuity & Trust Co. v. Cooper, 162 U. S. 529, 16 Sup. Ct. 879, 40 L. Ed. 1062, where it is said in the second paragraph of the syllabus:

"Findings of a master are not absolutely binding upon the court, but there is a presumption in their favor, and they will not be set aside or modified in the absence of some clear error or mistake."

In my judgment, the court should accord to the report of the referee that weight to which it is entitled, and, in the event his findings are disapproved, some reason should be given therefor; that is, the court should review the evidence and point out wherein it fails to sustain his findings.

The opinion omits several important facts

which in my judgment have a bearing upon the case. The defendant admits that he was familiar with the requirements of section 1560, Rev. Laws 1910, which required county attorneys to report within ten days all moneys collected by them, and admits that he at no time reported any of the collections. While campaigning for re-election in 1912, he publicly stated that he would not claim commissions of this character and would serve the people of his county for the salary fixed by law. He also received an opinion from the Attorney General that he was not entitled to such commissions. The referee finds that moneys were paid respondent under the guise of fines and costs, when there were no fine and costs, nor any judgment of any kind unless perhaps a dismissal, which was entered long after the money was collected; that there was no record made in the court or anywhere of the amounts collected; that there was private dickering out of court in regard to matters and amounts which could only be determined by judicial action; that in one instance moneys supposed to be paid for costs was considerably more than the costs amounted to: and that all of the money was retained for several years before it was paid over. The respondent knew these moneys collected by him did not go into the general fund of the county. The larger portion belonged to the common school fund and could not lawfully be diverted to any other purpose. In one case the costs amounted to $6.20, and in another instance $19.25. If all this be true, I cannot see how it can be urged that he had a right to take these moneys and apply them to claims against the county.

When defendant failed to report these collections required by section 1560, supra, he was guilty of a misdemeanor and became liable to punishment therefor. Section 2678. Rev. Laws 1910, expressly prohibits the retention of property or funds of another to offset or pay a demand held against him, and declares that this conduct shall not be a defense in a prosecution for embezzlement. Mr. Justice Brett, who writes the majority opinion, wrote the opinion for the Criminal Court of Appeals in Choate v. State, 12 Okla. Cr. 560, 160 Pac. 34, L. R. A. 1917A 1287, and in that case announced the view that the plea by a guardian that moneys were retained by him to offset a demand claimed against his ward amounted to a plea of guilty to a charge of embezzlement. If that was good law in that case, it ought to be good law under the circumstances here presented. If it is embezzlement for a guard-

ian to retain moneys belonging to his ward to offset a claim due by the ward to the guardian. I am unable to see where it would not be embezzlement for a county attorney to keep moneys belonging to the county to offset a claim against the county; but the situation shown by the report of the referee is even worse than that. The moneys he retained either belonged to the common school fund of the county, or were due to witnesses and officers to pay the costs incurred in certain litigation. I do not think the statute, making it a misdemeanor for a county attorney to neglect to report moneys collected by him, makes it any less a crime for him to embezzle such moneys. If it is, a county attorney might corruptly retain public money and appropriate same to his own use with impunity. It is a distinction without a difference to say that a guardian is guilty of embezzlement when retaining the money of his ward, and to say that a county attorney commits no crime when he unlawfully retains the moneys of the county. This court should refuse to recognize any difference in persons and declare embezzlement to be a crime whether committed by those in authority or by the humblest citizen in the land. If public office be a protection from punishment for crime of this character, a premium is placed upon dishonesty in public officials and an inducement offered to crooks and criminals to seek positions of power.

While this is not a criminal proceeding, this court possesses the undoubted power to inquire into the truth of the charge and to administer proper punishment and upon the record presented, should either say that the facts as found by the referee do not amount to conduct deserving punishment or in fairness to defendant that his findings are not supported by the evidence, and unless the court can say one if these two things, the only proper thing to do, in my judgment, is to inflict punishment commensurate with the wrong conduct proven.